## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JANE DOE,
Individually and on behalf of all
other similarly situated individuals,

     Plaintiffs,                       Case No.

v.                                  Hon.

DELAWARE NORTH COMPANIES, INC.,

     Defendant.

---

Noah S. Hurwitz (P74063)
Grant M. Vlahopoulos (85633)
HURWITZ LAW PLLC
*Attorneys for Plaintiff*
617 Detroit St. STE 125
Ann Arbor, MI 48104
(844) 487-9489
noah@hurwitzlaw.com
grant@hurwitzlaw.com

---

There is no other pending or resolved civil action arising out
of this transaction or occurrence alleged in the Complaint.

## **COMPLAINT AND JURY DEMAND**

Plaintiff Jane Doe ("Plaintiff"), by and through her attorneys, HURWITZ

LAW PLLC, hereby alleges as follows:

## **INTRODUCTION**

1.      This is an action for money damages, liquidated damages, costs, attorneys' fees, and other relief against Defendant Delaware North Companies, Inc., ("Defendant") precipitated by the termination of Plaintiff's employment after suffering a serious health condition in contravention of the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq*. and Michigan's Persons with Disabilities Civil Rights Act of 1976, M.C.L. § 37.1101 *et seq*.[1]  Plaintiff suffered a debilitating, life-threatening disability after receiving the first dose of the Pfizer COVID-19 vaccine pursuant to Defendant's vaccine mandate requiring all employees to be fully vaccinated.   Plaintiff's current diagnosis is postural orthostatic tachycardia, ventricular fibrillation, and peripheral neuropathy, which precludes her from taking a second dose of the COVID-19 vaccine.   Defendant nevertheless terminated Plaintiff's employment for not being fully vaccinated and denied her reasonable accommodation to Defendant's vaccine mandate.   Further, Defendant implements policies and practices to prevent Plaintiff and other similarly situated individuals employed as Corporate Finance Associates from being compensated overtime hours despite working in excess of 40 hours a week, including retroactively manipulating

---

[1] Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") and will be amending her complaint once she receives a right to sue letter to include a claim for violation of the Americans With Disabilities Act ("ADA").

employee timesheets in violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq*.  Defendant has also violated the Bullard-Plawecki Employee Right to Know Act, MCL 423.501 *et seq*.

2.      This action is brought pursuant to the opt-in collective action provisions of the Fair Labor Standards Act under 29 U.S.C. § 216(b), sometimes referred to as an "opt-in" class action.

3.      Plaintiff brings this action on her own behalf and on behalf of all other Corporate Finance Associates, present and former, who were and/or are affected by the actions, pay schemes, policies, and procedures of Defendant.   In addition, Plaintiff brings this action in her individual capacity, separate and apart from the collective action claims set forth herein.

## PARTIES AND JURISDICTION

4.      Plaintiff Jane Doe is an individual residing in Warren, Michigan, which is located in Macomb County.

5.      Defendant Delaware North Companies, Inc. is a foreign profit corporation with its principal place of business in Buffalo, New York.

6.      Defendant has a resident agent located in Plymouth, Michigan, which is located in Wayne County.

7.      Plaintiff's claims arise out of Defendant's multiple violations of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq*., the Fair Labor

Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq*., Michigan's Persons with Disabilities Civil Rights Act of 1976 ("PWDCRA"), M.C.L. § 37.1101 *et seq*., and the Bullard-Plawecki Employee Right to Know Act, MCL 423.501 *et seq*.

8.     This Court has general federal question jurisdiction pursuant to 28 U.S.C. § 1331.  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's state law claim.

9.     Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. § 1391, as it is the district where the events giving rise to Plaintiff's claims took place and where Defendant regularly conducts business.

10.     The facts and unlawful employment practices within the meaning of the FMLA, FLSA, and PWDCRA giving rise to this Complaint occurred within the Eastern District of Michigan.

11.     Defendant is an employer and Plaintiff was its employee at all relevant times within the meaning of the FMLA, FLSA and PWDCRA.

## GENERAL ALLEGATIONS

12.      Plaintiff incorporates by reference herein the allegations contained in the foregoing paragraphs.

13.     Defendant is a foreign profit corporation providing food and beverage concessions, dining, lodging, and retail at many large venues and events.  These

include sports stadiums, entertainment complexes, national and state parks, airports, and casinos.

14.    Plaintiff was employed as a Corporate Finance Associate at Defendant's office in Wayne, Michigan for over a year.

15.    Plaintiff performed accounting functions for events taking place at Little Caesars Arena, Comerica Park, and Hockeytown.

16.    On August 25, 2021, Plaintiff returned to work after a long furlough and soon learned that Defendant had mandated the COVID-19 vaccine.

17.    Defendant advised its employees that refusal to be <u>fully</u> vaccinated by December 31, 2021 would result in termination.

18.    Defendant incentivized getting vaccinated by offering a bonus worth four hours of pay to employees who showed proof of vaccination status.

19.    In the face of Defendant's ultimatum, Plaintiff received her first dose of the Pfizer vaccine on September 21, 2021.[2]

20.    Shortly after the vaccination, Plaintiff began experiencing an inexplicable numb sensation in her body.

21.    Plaintiff soon experienced her heart beating at an irregularly fast rate.

22.    Plaintiff explained her symptoms to a medical professional and then reported to the emergency room.

---

[2] Notably, Plaintiff never received her vaccination bonus.

23.    Plaintiff's physician notes provide:

> [Patient] had COVID vaccine a week ago (Pfizer).  She
> never had COVID.   She has had issues with leg
> numbness/welts and generally not feeling well.  Has been
> [shortness of breath] since yesterday and almost passed
> out in the shower, no injury.  Today she has noticed her
> [heart rate] consistently around 140-145 even when resting
> which makes her feel weak [and] anxious and gives her
> chest pain.  She now has feeling in her legs but they feel
> restless and jumpy.  Despite concerns for [Guillain-Barre
> syndrome] and myocarditis, [patient] did not go to
> [emergency room] so far.  I did advise [patient] to do so
> and to pack an overnight bag.   She will need an
> echocardiogram,    labs    and    fluids    and    possible
> [prescription] to bring [heart rate] down.

24.    Plaintiff notified her supervisors of her medical condition and reported
to Ascension St. John Hospital in Detroit, Michigan.

25.    For the next two days, Plaintiff stayed overnight in the Cardiac
Observation Unit.

26.    After being discharged from Ascension St. John Hospital Cardiac
Observation Unit, Plaintiff's systems persisted.

27.    Plaintiff was referred to Cardiologist Dr. David Rodriguez at East Lake
Cardiovascular Services in St. Clair Shores.

28.    Dr. Rodriguez conducted a multitude of overnight tests on Plaintiff
throughout the month of October 2021.

29.    Plaintiff recalls Dr. Rodriguez stating, "you have something wrong,"
but he could not resolve the issue.

30.    Dr. Rodriguez prescribed Plaintiff two different medications, Diltiazem and Verapamil; they had no remedial effect.

31.    Dr. Rodriguez also ordered Plaintiff to wear a heart monitor.

32.    A physician note on October 12, 2021 states:

> [Plaintiff] had a severe reaction after her first Covid vaccine (Pfizer). She was seen in the emergency room and [the Clinical Decision Unit] on 9/28 for concerns about myocarditis/pericarditis which is a known serious side effect of the vaccine. The patient was discharged after consultation with cardiology. She was placed on medication and is monitored frequently as her issues have not resolved. She was advised by her cardiologist that she should not receive the second Covid vaccine unless cleared by cardiology and off all medication. Due to the lengthy healing process this will not be for many months and quite possibly never. <u>It is contraindicated to administer a second Covid vaccine for any reason as this could lead to very serious health consequences and even death.</u> The patient is being closely monitored here at least monthly as well as by her cardiologist to safeguard her health and monitor progress.

33.    When Plaintiff's condition continued to deteriorate, Dr. Rodriguez referred her to Cardiac Electrophysiologist Dr. Salem Sayar at the Ascension Heart Rhythm Institute.

34.    On November 11, 2021, Dr. Sayar performed an electrocardiogram on Plaintiff.

35.    Following the procedure, Dr. Sayar gave Plaintiff two daunting options for treatment: (1) undergo annual cardiac ablation—a procedure where heat or cold

energy is utilized to create tiny scars in the heart to block abnormal electrical signals; or (2) undergo surgery to get a pacemaker implanted in her heart.

36.     Neither option would be necessary if the Company had not forced Plaintiff to take the COVID-19 vaccine to save her employment.

37.     The severity of Plaintiff's cardiac health bewildered local specialists. Despite being treated by a host of cardiologists, she was left without answers and in dismay over her life-threating condition.

38.     Plaintiff's case was so complex that Dr. Richard Lang of the Executive Health Department at the Cleveland Clinic—one of the top cardiology hospitals in the world—was notified.

39.     Dr. Lang reviewed Plaintiff's patient history and, within days, referred Plaintiff to Cardiologist Dr. Mohammed Kanj of the Cleveland Clinic.

40.     Dr. Kanj's Progress Notes from their first interaction on December 8, 2021 outlines his evaluation of Plaintiff's inappropriate sinus tachycardia:

> Started after a COVID vaccine. This had significant effects on her life. This could [be] an autonomic nervous and possible inflammatory cause of this disorder, I personally have not seen it with the vaccine but have seen multiple patients after COVID infection. I explained the possible inflammatory cause of this. She continues to be symptomatic despite a trial of multiple rate control medications. Thus, I recommend she sees our autonomic colleagues at Cleveland Clinic and I will make referrals for that.

41.     In addition, Dr. Kanj ordered an electrocardiography rhythm strip, which captured her irregular heart rate.

42.     Four days later, on December 12, 2021, Plaintiff traveled to the Cleveland Clinic for her second visit.  This time, however, she was treated by Doctor of Osteopathic Medicine Dr. Jeffery Courson.

43.     During his examination, Dr. Courson informed Plaintiff that the medications other specialists prescribed were incorrect (including Diltiazem, Verapamil, Ketorolac, Metoprolol, and a multivitamin), and she will require a pacemaker for the rest of her life.

44.     "There is no recovery.  You won't be back to any sort of 'normal'" Dr. Courson advised.

45.     As a result, Dr. Courson ordered Plaintiff to regularly undergo cardiac rehab; a cardiovascular autonomic reflex with and without tilt test, which measures how the nervous system works and to control blood pressure and heart rate; a quantitative sudomotor axon reflex test, which measures the nerves that controls sweating; a skin biopsy for neuropathy; and a tile table evaluation.

46.     Plaintiff's first session of cardiac rehab was on February 14, 2022.

47.     Dr, Courson's lates latest Progress Note from March 9, 2022 provides:

> We discussed in detail her recovery time and I communicated a full recovery is highly unlikely and a 60-65% recovery level could take 5-7 years.  I explained in detail the severity of a left to right shunt.  Surgery options

were discussed as well for the left to right shunt as well as
a pacemaker, however at this time we cannot make any
final decisions until all testing is complete.

48.    Meanwhile, amidst the chaos, Plaintiff continued to work for Defendant

as a loyal employee.  Defendant was aware of Plaintiff's condition and offered her

protected intermittent medical leave under the FMLA and as a disability

accommodation beginning on November 2, 2021.

49.    Even though Plaintiff would not normally have been eligible for the

FMLA, the Company's offer of intermittent FMLA is binding.  *Minard v. ITC*

*Deltacom Communications, Inc.*, 447 F.3d 352 (5th Cir. 2006) (equitable estoppel

applied because employer informed employee she was entitled to FMLA).

50.    Human Resources Manager Asia Thomas and Plaintiff's superiors

specifically asked her to apply for FMLA.

51.    Plaintiff's physician filled out the FMLA form.

52.    Defendant formally approved her FMLA leave with confirmation to

Plaintiff.

53.    Plaintiff then utilized her FMLA intermittent leave to attend her

treatments with the various cardiologists and perform her duties for Defendant at the

same time.

54.    While at work on December 13, 2021, Plaintiff's father told her that he

tested positive for COVID-19.  She was with him days prior.

55.     Given Plaintiff's medical condition and the fatal consequences if she contracts the virus, she went to be tested.

56.     Plaintiff left work and took her computer to work remotely in the event her results were positive.

57.     Fortunately, Plaintiff tested negative.

58.     However, just as she was leaving the testing facility, Plaintiff's supervisors (Controller Tim Gaughan and Accountant Danielle Schoenner) called her.

59.     Mr. Gaughan and Ms. Schoenner instructed Plaintiff not to report to work for ten (10) days because of her exposure to COVID-19.  Further, Plaintiff would not be paid during those ten (10) days because she was not fully vaccinated—which meant Defendant disregarded Plaintiff's ability to work remotely as a reasonable accommodation.

60.     Defendant made this directive despite being aware that Plaintiff's life-threatening condition precludes her from receiving a second dose of the COVID-19 vaccine.

61.     Additionally, Mr. Gaughan and Ms. Schoenner requested Plaintiff to once again apply for FMLA intermittent medical leave.

62.     Later that day, Plaintiff initiated a group text with Mr. Gaughan and Ms. Schoenner.  Plaintiff messaged the following:

> Is [Ms. Thomas] supposed to call me?  I have a pile of
> medical bills from a vaccine that was mandated and I
> cannot afford to not be paid for 10 days because I cannot
> get fully vaccinated.   I gave [Ms. Thomas] all the
> documentation from my doctors that says I cannot get a
> second dose.

63.     Mr. Gaughan responded, "[Ms. Thomas] is in a meeting right now."

Plaintiff replied, "I just don't really understand this.  How come it wasn't a problem

when [Mr. Gaughan] and I got tested when [Ms. Schoenner] was positive?"

64.     Eventually, Plaintiff stated, "If corporate won't pay me for 10 days then

they're going to have to cover the medical bills I have from their vaccine mandate."

65.     Remarkably, Mr. Gaughan then advised Plaintiff to not pay her medical

bills because Defendant's insurance plan will cover it:

> Also, let your insurance run its course on those.  I never
> pay a medical bill when I first get it.  The hospital plays
> phone tag with the insurance company and they figure it
> out.  They're short staffed too so it takes a bit.  I got a 4k
> medical bill in September… Last week the bill got wiped
> out by insurance.  Let the red tape machine run its course.

66.     Plaintiff had already paid approximately $3,000 out of pocket.

67.     The next day, Ms. Schoenner called Plaintiff to inform her that

"Corporate HR was going to make a decision" on whether she can be paid for the

ten (10) days.  A few hours later, Ms. Schoenner told Plaintiff the Company would

provide her six days of vacation time.

68.    On December 20, 2021—days before Christmas—Ms. Thomas and Mr. Gaughan terminated Plaintiff.

69.    Mr. Gaughan explained that "corporate reviewed everything" and Plaintiff was being terminated for not getting the second dose of the COVID-19 vaccine.

70.    Defendant's reasoning is in direct conflict with the medical judgment of Cleveland Clinic's medical experts, a denial of Plaintiff's request for medical accommodation, and a patent violation of the PWDCRA.

71.    Defendant knew this and still terminated her.

72.    At all times relevant to this Complaint, Defendant has been, and continues to be, an employer engaged in interstate commerce within the meaning of the FLSA, 29 U.S.C. § 203.

73.    Defendant implements policies and practices to prevent Plaintiff and other similarly situated individuals from being compensated overtime hours despite working over 40 hours a week.

74.    At all times relevant to this Complaint, Plaintiffs and other similarly situated individuals are/were employed as Corporate Finance Associates at Defendant's offices.

75.    At all times relevant to this Complaint, Defendant directly hired Plaintiff and other Corporate Finance Associates to work on its behalf, paid them

wages and benefits, controlled their work schedules, duties, protocols, applications, assignments and employment conditions.

76.    Defendant employees Corporate Finance Associates at all of its offices.

77.    The basic duties of a Corporate Finance Associate is the same at every office and are primarily made up of non-managerial and non-administrative tasks.

78.    Corporate Finance Associates are not separately trained to perform managerial and administrative duties.

79.    Corporate Finance Associates do not require specialized knowledge, advanced degrees, or certification.

80.    Plaintiff does not schedule employees.

81.    Plaintiff does make final hiring decisions.

82.    Plaintiff does not have discretion to terminate facility employees.

83.    Plaintiff cannot set and/or adjust rates of pay and hours of work.

84.    Plaintiff does not have discretion to direct the work of other employees.

85.    Plaintiff does not have discretion to make status changes or recommend promotion.

86.    Plaintiff cannot discipline employees.

87.    Plaintiff does not have a role in planning and/or controlling the budget.

88.     Plaintiff does not perform office or non-manual work directly related to the management or general business operations of Defendant or Defendant's customers.

89.     Plaintiff does not exercise discretion and independent judgment with respect to matters of significance.

90.     Plaintiff did not have authority to make independent choices, free from immediate direction or supervision.

91.     Plaintiff did not have authority to formulate, affect, interpret, or otherwise implement management policies or operating practices.

92.     Plaintiff did not have authority to waive or deviate from established policies and procedures without prior approval.

93.     Plaintiff does not act as an advisor of Defendant's customers.

94.     Defendant pays all Corporate Finance Associates a salary for work performed but does not pay Corporate Finance Associates overtime compensation for the hours they worked in excess of forty (40) hours a week.

95.     Plaintiffs and other similarly situated individuals consistently and regularly work more than forty (40) hours per week but are not compensated for their overtime work by Defendant.

96.     Plaintiff worked approximately fifty-five (50) hours a week.

97. Defendant classifies all Corporate Finance Associates as exempt from the overtime pay requirements of the FLSA and applicable state law, regardless of property location, sales volume, property size, climate, experience, number of Corporate Finance Associates in a location, prior experience, the number of employees in that location, the shift they worked, or other factors.

98. The primary duty of each Corporate Finance Associates is to perform the non-managerial and non-administrative labor that other coworkers are tasked with performing.

99. Any management duties assigned to Corporate Finance Associates are routine and supervised by their superiors.

100. The management work performed by Corporate Finance Associates do not take priority over non-managerial tasks.

101. Any administrative duties assigned to Corporate Finance Associates are routine and supervised by their superiors.

102. The administrative work performed by Corporate Finance Associates does not take priority over non-administrative tasks.

103. Plaintiff and other similarly situated individuals do not always direct the work of at least two or more other full-time employees or their equivalent.

104. Corporate finance associates receive voice calls and text messages outside of scheduled work hours.

105. The work performed by Corporate Finance Associates renders them non-exempt.

106. Defendant applied its policy and practice of not paying overtime compensation to employees who were designated as Corporate Finance Associates in the same manner to all Corporate Finance Associates.

107. As a result of the misclassification as exempt employees, Defendant's Corporate Finance Associates were and/or are being unlawfully deprived of overtime compensation for all hours worked in excess of forty (40) per week.

108. With respect to the collective action claims under the FLSA, the collective action class is defined as (a) all current and former Corporate Finance Associates of Defendant who are/were required to work in excess of 40 hours per week and deprived of unpaid wages, compensable time, overtime, and vacation time from three (3) years preceding the filing of this lawsuit through the culmination of this litigation at any of Defendant's Michigan facilities.  Plaintiffs reserve the right to amend said class definition consistent with information obtained through discovery.

## COUNT I
## FAMILY MEDICAL LEAVE ACT RETALIATION

109. Plaintiff incorporates by reference herein the foregoing paragraphs and allegations.

110.   Plaintiff dutifully and professionally performed her duties as a Corporate Finance Associate for over two years.  It was not until sustaining a debilitating injury and notifying Defendant of her need to take a protected FMLA absence that her employment was terminated.

111.   Plaintiff's injury is a serious health condition under the FMLA, as it is an injury, impairment, or physical condition that involved inpatient care in a hospital and continuing treatment by a health care provider.  29 U.S.C. § 2611(11).

112.   The conversations between Plaintiff and Mr. Gaughan, Ms. Thomas, and Ms. Schoenner placed Defendant on notice that Plaintiff required protected medical leave under the FMLA. "[T]o invoke the protection of the FMLA, an employee must provide notice and a qualifying reason for requesting the leave." *Brohm v. JH Props., Inc.*, 149 F.3d 517, 523 (6th Cir. 1998).

113.   Defendant terminated Plaintiff's employment due to the exercise of her rights under the FMLA.

114.   A causal connection exists between the exercise of Plaintiff's protected right and her termination.  "Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008).

115.   Defendant cannot set forth evidence that it planned the elimination of Plaintiff's job before his protected medical leave.

116.   By terminating Plaintiff's employment prior to her protected return to work date, Defendant failed to comply with 29 U.S.C. § 2614(a)(1)(A)-(B) which states that an employee returning from medical leave has the right to "be restored by the employer to the position of employment held by the employee when the leave commenced" or "to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment."

117.   Defendant's actions in violation of the FMLA were willful.

118.   As a direct and proximate result of Defendant's retaliation against Plaintiff for exercising his FMLA rights, Plaintiff suffered bodily injury, feelings of depression, emotional and physical distress, mental and physical anguish, loss of reputation, humiliation and embarrassment, and the physical effects associated therewith, and will continue to suffer in the future.

119.   As a further direct and proximate result of Defendant's violation of the FMLA, Plaintiff has been placed in financial distress and has suffered a loss of earnings and benefits, and a loss of and impairment of her earning capacity and ability to work in the future.

**COUNT II**
**MICHIGAN'S PERSONS WITH DISABILITIES CIVIL RIGHTS ACT**

120.    Plaintiff incorporates by reference herein the foregoing paragraphs and allegations.

121.    Plaintiff has a disability within the meaning of the PWDCRA.

122.    Plaintiff was able to perform her job with or without reasonable accommodations and did perform satisfactorily.

123.    Plaintiff's disability was unrelated to her ability to perform the duties of her job.

124.    Defendant discriminated against Plaintiff on the basis of her disability.

125.    As a result, Plaintiff was harmed, and continues to be harmed, in that she has suffered economic and non-economic loss, including, but not limited to, lost wages, damage to professional reputation, emotional distress, outrage and humiliation.

**COUNT III**
**RETALIATION IN VIOLATION OF**
**MICHIGAN'S PERSONS WITH DISABILITIES CIVIL RIGHTS ACT**

126.    Plaintiff incorporates by reference herein the foregoing paragraphs and allegations.

127.    Plaintiff has a disability as defined by Michigan's Persons with Disabilities Civil Rights Act, M.C.L. 37.1103(d).

128.   Defendant retaliated against Plaintiff for her request for a reasonable accommodation in violation of the PWDCRA, by and through its agents, servants, and/or employees, by acts including, but not limited to, terminating Plaintiff's employment and replacing her.

129.   Defendant's adverse actions violate the PWDCRA, MCL 37.1202.

130.   As a direct and proximate result of Defendant's violation of the PWDCRA, Plaintiff has suffered emotional and physical distress, mental and physical anguish, loss of reputation, humiliation and embarrassment and the physical effects associated therewith, and will so suffer in the future.

131.   As a further direct and proximate result of Defendant's violation of the PWDCRA, Plaintiff has been placed in financial distress and has suffered a loss of earnings and benefits, and a loss of and impairment of her earning capacity and ability to work, and will so suffer in the future; she has been required to employee the services of an attorney to bring this lawsuit and will suffer additional damages in the future.

### COUNT IV
### VIOLATION OF THE FAIR LABOR STANDARDS ACT ON BEHALF OF PLAINTIFFS, INDIVIDUALLY, AND ON BEHALF OF ALL OTHER SIMILARLY SITUATED EMPLOYEES, CURRENT AND FORMER

132.   Plaintiffs incorporate by reference herein the foregoing paragraphs and allegations.

133. The collective action class which Plaintiffs seek to certify as a FLSA 29 U.S.C. § 216(b) "opt-in" Class Action is defined as all current and former Corporate Finance Associates who worked for Defendant at any time from three (3) years preceding the filing of this lawsuit through the culmination of this litigation at any of Defendant's offices. Plaintiffs reserve the right to amend said class definition consistent with information obtained through discovery.

134. At all times relevant to this Complaint, Plaintiffs were Defendant's employees within the meaning of the FLSA, 29 U.S.C. § 201 *et seq.*

135. At all relevant times to this Complaint, Defendant was Plaintiffs' employer within the meaning of the FLSA, 29 U.S.C. § 201 *et seq.*

136. At all relevant times to this Complaint, Defendant has been, and continues to be, an employer engaged in interstate commerce within the meaning of the FLSA, 29 U.S.C. § 203.

137. The FLSA, 29 U.S.C. § 207, requires employers to pay employees on and one-half (1.5) times the regular rate of pay for all hours worked over 40 hours per week.

138. Plaintiffs often worked more than 40 hours per week without overtime pay.

139. Plaintiffs worked outside of regularly scheduled shifts.

140.   Defendant is aware, or should have been aware, that Plaintiff performed work that required payment of overtime compensation.

141.   In violation of the FLSA, Defendant failed to pay Plaintiffs and other similarly situated individuals compensation or unpaid wages, compensable time, overtime, and vacation time.

142.   Defendant has a policy and practice of failing and refusing to pay Plaintiff and all other similarly situated employees for all hours worked in violation of the FLSA, 29 U.S.C. §§ 201, *et seq*.

143.   As a direct and proximate result of Defendant's unlawful conduct, Plaintiffs have suffered will continue to suffer a loss of income and other damages.

144.   The foregoing conduct, as alleged, constitutes a willful violation of the FLSA.   Defendant knew, or showed reckless disregard for the fact, that its compensation practices were in violation of these laws.

145.   As a result of Defendant's unlawful acts, Plaintiff and all other similarly situated current and former employees are being deprived of earned wages in amounts to be determined at trial.   They are entitled to compensation for unpaid overtime wages, interest, liquidated damages, attorneys' fees and costs, and any other remedies available at law or in equity.

**COUNT V**
**FAILURE TO PROVIDE PERSONNEL FILE PURSUANT TO**
**BULLARD-PLAWECKI EMPLOYEE RIGHT TO KNOW ACT**

146.   The "Bullard-Plawecki Employee Right to Know Act," MCL 423.501 *et seq*. ["Right to Know Act"], in relevant part grants an employee the right to receive a copy of his or her personnel records.

147.   Plaintiff made a written request for her personnel records in a letter dated January 21, 2022.  The letter was delivered through undersigned counsel.

148.   To date, the personnel records have not been furnished, nor any reason or communication advanced for the refusal.

149.   Defendant has therefore violated the Right to Know Act by willfully and knowingly refusing to send Plaintiff a copy of her personnel records.

150.   Defendant's willful violation of the Right to Know Act has damaged Plaintiff as described herein and below, and entitled to injunctive relief, $200 plus actual damages, costs, and reasonable attorney fees.

**COUNT VI**
**VIOLATION OF MICHIGAN'S COVID-19 EMPLOYMENT RIGHTS ACT**

151.   Plaintiff incorporates all proceeding paragraphs above as though fully stated herein.

152.   On October 22, 2020, the Michigan legislature passed Public Act 238 of 2020 (later codified as the COVID-19 Employment Rights Act), including MCL

419.403, which created protections for employees and is designed to "prohibit an employer from taking certain actions against an employee who does not report to work under certain circumstances related to COVID-19; to prohibit an employee from reporting to work under certain circumstances related to COVID-19; to prohibit discrimination and retaliation for engaging in certain activities; and to provide remedies."

153.   MCL 419.403 states that an employer "shall not discharge, discipline, or otherwise retaliate against an employee who (a) complies with the stay-home provisions set forth [in the Act]; (b) Opposes a violation of this act; or (c) Reports health violations related to COVID-19."

154.   Plaintiff complied with the stay-home provisions in the Act when she did not report to work after being exposed to someone with COVID-19.

155.   Plaintiff was terminated shortly after she quarantined.

156.   MCL 419.407(1) states, "[a]n employee aggrieved by a violation of this act may bring a civil action for appropriate injunctive relief or damages, or both, in the circuit court for the county where the alleged violation occurred or for the county where the employer against whom the action is filed is located or has its principal place of business."

157.   MCL 419.407(2) states, "[a] court shall award to a plaintiff who prevails in an action brought under this act damages of not less than $5,000.00."

## **DEMAND FOR RELIEF**

WHEREFORE, Plaintiff claims, individually and on behalf of all other similarly situated individuals as follows:

a.      Judgement against Defendant in the amount of Plaintiff Jane Doe's unpaid back pay, front pay, injunctive relief, declaratory judgment, liquidated damages, punitive damages, and attorney fees under the FMLA, PWDCRA, Right to Know Act, and COVID-19 Employment Rights Act;

b.      Designation of this action as a collective action pursuant to the FLSA and prompt issuance of notice pursuant tot 29 U.S.C. § 216(b).

c.      An award of unpaid overtime wages under the FLSA;

d.      An award of unpaid wages for compensable hours under the FLSA;

e.      An award of unaccrued vacation time under the FLSA;

f.      An award of liquidated damages under the FLSA;

g.      Interest;

h.      Attorneys' fees and costs under the FLSA; and

i.      Such other relief as in law or equity may pertain.

Respectfully Submitted,
HURWITZ LAW PLLC

*/s/ Noah S. Hurwitz*_____
Noah S. Hurwitz (P74063)
*Attorneys for Plaintiff*
617 Detroit St. STE 125

Ann Arbor, MI 48104
(844) 487-9489

Dated: March 21, 2022

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

JANE DOE,
Individually and on behalf of all
other similarly situated individuals,

      Plaintiffs,                                 Case No.

v.                                                  Hon.

DELAWARE NORTH COMPANIES, INC.,

      Defendant.

---

Noah S. Hurwitz (P74063)
Grant M. Vlahopoulos (85633)
HURWITZ LAW PLLC
*Attorneys for Plaintiff*
617 Detroit St. STE 125
Ann Arbor, MI 48104
(844) 487-9489
noah@hurwitzlaw.com
grant@hurwitzlaw.com

---

## <u>DEMAND FOR TRIAL BY JURY</u>

NOW COMES Plaintiff Jane Doe, by and through her attorneys, HURWITZ

LAW PLLC, and hereby demands a jury trial in the above-captioned matter for all

issues so triable.

Respectfully Submitted,
HURWITZ LAW PLLC

/s/ Noah S. Hurwitz
Noah S. Hurwitz (P74063)
*Attorneys for Plaintiff*
617 Detroit St. STE 125
Ann Arbor, MI 48104
(844) 487-9489

Dated: March 21, 2022